First case on the call this morning is agenda number 11, number 108909, People of the State of Illinois v. Ira Mullins. Counsel, you may proceed. Good morning. Honorable Justices of the Court, Counsel, may it please the Court Assistant State's Attorney Noah Montague on behalf of the people in this matter. Your Honors, this matter comes before this Court because this defendant has been tried, convicted, charged, tried and convicted with the offense of possession of a controlled substance with intent to deliver. Before trial, this defendant moved to have his three prior convictions for the same offense excluded. The trial court, however, delayed its ruling on his motion in limine until after he testified. At trial, the evidence showed that the Chicago police set up a surveillance in an area known for heavy narcotics traffic at the area of the intersection of Washington and Kilbourne on the west side of Chicago. The officer set up surveillance around 11 p.m. on February the 1st of 2005, at which time he saw a defendant standing by himself in the northwest corner of the intersection. The defendant was then seen in the next 30 minutes conducting three narcotics transactions. Each time, the defendant was approached by a single pedestrian who handed defendant money. Defendant shoved that money into his pocket and then turned around to the fence behind him, reached into a fence post and pulled out a small object and handed it to the pedestrian. After the third transaction, the Chicago surveillance officer called in other officers on his team who were around the corner. They approached defendant, went up to the fence post at the direction of the surveillance officer and went to the fence post that he was seen reaching into. Inside that fence post, they found a bag with three small tinfoil packets of heroin in it. That bag and the contents were later inventory tested and admitted at trial as people's exhibit number one. The officers then placed defendant under arrest. A search incident to arrest revealed that the defendant had three $5 bills and three $1 bills in his pocket, all crumpled up in his front pants pocket. Pursuant to his arrest, people, the officers then asked defendant his name and his address and background information of that sort. And the defendant said that he lived at 210 North Central Avenue in Chicago, Illinois. Defendant then presented the testimony of Trenton Greyer, a 15-year-old. Defendant is, I believe, at trial. Trenton Greyer was 15 and defendant was 28. Greyer testified that he and defendant had been friends for several years. And that Greyer actually testified that they rode the bus together on the day that Greyer testified. Greyer testified that defendant, in fact, on the day he was arrested, did not live in Chicago, but lived in Detroit and came to Chicago visiting. He had one piece of luggage with him, Greyer and another friend picked him up, drove him around town, and then at defendant's request, dropped him off at the corner of Washington and Kilbourn so defendant could go to a hotel. Greyer testified that they dropped defendant off at precisely 11.15 p.m. and that they gave defendant one $10 bill and two $1 bills before he left. Greyer testified that he and the other friend then left and did not see defendant again that night after 11.15 p.m. Defendant then testified that he went over, after getting out of the car, he went over to the hotel on the southwest side of the intersection and attempted to rent a room for four hours from 11.15 p.m. to 3.15 a.m. And while the hotel did have hourly rates, defendant did not have enough money for four hours, so he left the hotel, called his friends for more money, and while waiting for them was beckoned across the street to the northwest corner of the intersection by an old friend whom he knew only by the name West. West happened to live in the house at the location where he was eventually arrested and West took defendant's luggage inside of the house, leaving defendant standing alone on the northwest corner of the intersection by himself with no luggage at the exact moment that the police showed up. Defendant, of course, testified that he denied any wrongdoing. After defendant's testimony, the trial court then heard arguments from both sides on the admissibility of his prior convictions and decided to allow one conviction to be admitted but excluded the other two. The conviction was admitted by stipulation and defendant was convicted of the charged offense. This case is here, of course, because the appellate court then, while it originally affirmed, was asked to reconsider its opinion based on this court's decision in Patrick and clearly finding a Patrick error as the trial court here delayed its decision on the motion in limine until after the defendant testified with no justification given. The court then conducted a harmless error analysis, which consisted solely of quoting this court's harmless error analysis from Patrick, or part of it at least, and then stating in one sentence that, for the same reasons in Patrick, we find that this defendant was substantially prejudiced. Why do you say the appellate court used the structural error analysis? I thought that at page 10 of Patrick's opinion, it does not contain a structural error analysis. Can't we presume the appellate court knew of the difference between the structural error and Chapman analysis? Yes. In fact, I thought he mentioned Patrick. Yes, the appellate court did mention Patrick. And what I've tried to argue in this case is that they treated it as if it was a structural error, a de facto structural error. And here's the reason why. No, the appellate court here in Mullins treated the Patrick decision as if it was structural, while in name not. And the reason I say that is because what the court did in this case is to say, well, for the same reasons in Patrick, we find the defendant here was substantially prejudiced. But if you look at the two cases and in the people's brief, the people explain and contrast the two cases, the cases aren't at all the same. But counsel, isn't it true that in Patrick, the court did not conduct the traditional harmless error review, and that the trial court followed it exactly? Well, not entirely, Your Honor. That's a two-part question, let me answer. You know, it is the people's position, of course, and this court agreed in Averitt that the court did conduct a proper harmless error analysis. But the defendant in Averitt didn't testify. Correct. But in Averitt, this court, in fact, did review its decision in Patrick and said, you know, we did look at the whole record. We did do a harmless error analysis. I believe that was part of the structural error issue, because the court said, well, we did this harmless error analysis, and that shows that it was not a structural error. But because the defendant did testify in Patrick, isn't that a good reason why the court followed Patrick as opposed to Averitt? Correct. But what I was saying is that this court in Averitt was discussing its own decision in Patrick. That's why I was saying that, Your Honor. But what I was getting to is that what the court did here in following Patrick did not follow the entirety of the Patrick analysis. What the court did here was to follow the first paragraph of the analysis, which noted several tactical and strategic decisions that were affected by the delayed ruling, and then stopped there, because the bottom of that paragraph says, well, then the defendant is substantially prejudiced. But the court here, the appellate court here, did not note that this court goes on in its analysis to say, one, the defendant did not have to testify in Patrick. Two, the defendant presented an affirmative defense, which the evidence was weak enough in Patrick that the jury returned a verdict for a lesser included offense based on that affirmative defense. And three, that the appellate court here didn't follow in Patrick, that this court noted in Patrick that there was muse made of that prior conviction in closing argument, because we argued in Patrick that, you know, because this person has prior convictions, they're not credible. And what I was saying earlier in response to Justice Freeman's question was that this case is substantially different from Patrick, and we note that in our brief. And when you look at it, you see, well, in this case, at least we would say, and it's pretty clear, that the defendant had to testify. The evidence was overwhelming, and there was no mention whatsoever made of this prior conviction in argument.  And so when you see the appellate court here saying, well, for the same reasons in Patrick, we find that this was not a harmless error, it's very clear that the appellate court was not basing that harmless error analysis on the entire record. And that's really one of the points that the people have tried to emphasize here, that the harmless error analysis under Illinois jurisprudence should always include a view of the entire record. And the people in their brief actually point out two cases, one from the early 20th century and one from the late 20th century, which both use that language. The point being, of course, is that this notion of using and looking to the whole record to determine if an error is harmless has been around for a long time, and it's a well-established thing. And it's clear that the court did not do that here, because there are such differences between this case and Patrick's case. Now, obviously, we were asking this court to clarify what is the proper harmless error review for a Patrick error in these types of cases. And the first thing that people would ask this court to clarify is, what is the proper standard of review for a Patrick error? Obviously, in Patrick, this court said, applied the harmless beyond a reasonable doubt standard. But as I mentioned earlier, in the case of People v. Averitt, both of which had the same error, the trial court's delay ruling on motions and limine until after the defendants testified, this court in that case faced two defendants who both said, you know what? In Patrick, you guys found a constitutional error, that that delay made a constitutional error. And so in the Averitt opinion, there's a subsection B entitled constitutional error, in which this court, because of that argument, first looks at its own opinion in Patrick and says, you know what? In Patrick, we did mention multiple constitutional provisions, but we did not, however, find that the delay, an improper delay in ruling on a motion and limine violated a defendant's constitutional rights. And this court then went on to say, well, you know what? In Averitt's case and in Tucker's case, there's no violation of constitutional rights. So it would appear, based on that Averitt opinion, clearly stating that improper delay in ruling on a motion and limine does not constitute a constitutional error, creates an irreconcilable difference between this court's use of the harmless error beyond a reasonable doubt standard in Patrick and its past precedent, such as the case of In Re, E.H., which the people have cited, in which this court has clearly stated that there are two harmless error standards, one harmless beyond a reasonable doubt, which is applied only to constitutional errors, and the other, simple harmless, which is applied to evidentiary, or excuse me, is applied to other trial errors that are not constitutional. And it's important to note in In Re, E.H. that the two cases that this court cites as examples of both of those types of harmless error, the first is People v. Nevitt, which is, in the parenthetical there, called an error in an evidentiary ruling. And that's exactly what a Patrick error is, because it's important to note that in Patrick, this court still left the trial courts the discretion to delay that ruling. So as part of making that evidentiary ruling, courts still have the discretion to delay the ruling, and the delay, improperly delaying that ruling, is simply an abuse of that discretion. It's an abuse of the discretion given to the court in making an evidentiary ruling, which this court, in citing People v. Nevitt, cited an error in an evidentiary ruling as an example of a case that should properly be reviewed for harmless error under the regular standard. And the example given in Re, E.H. of a constitutional error is, in fact, Chapman. And that's, of course, correct, because Chapman involved a finding of a violation of the Fifth Amendment, a comment on someone's right to silence. And you'll note that in Chapman, they don't just say in Chapman, well, we have a constitutional error here, so we're going to apply this standard. The court goes through and discusses what type of standard should we apply in this instance when we have a constitutional error. And in making that discussion, the court says, well, look, this is what federal rules require for a regular harmless error standard. This is what state rules require for regular harmless error standard. But we think that because there is a constitutional error here, it should be a higher standard. It should be something more. But the impetus for that higher standard is the presence of a constitutional error. There was nothing in the opinion that stated that that standard should be used for anything other than a constitutional error. And so it seems that there's a significant difference that needs to be reconciled between this court's opinion and average, which says there is no constitutional error here whatsoever, and this court's then other decisions like Enray, E.H., and Patrick, which say on the one hand, nonconstitutional errors get harmless standard, and Patrick, which says this error here should have harmless beyond reasonable doubt. And so it is the people's position that this matter should be reconciled so that the proper standard or review is used in this error, which is that for a nonconstitutional error, which is what this error is. Now, as far as what constitutes a proper harmless error analysis of Patrick error, I mean, the first and foremost, as the people have already mentioned, would be to look at the whole record. And the appellate court's opinion here really makes this a point of emphasis, that as this is a well-established part of harmless error jurisprudence, every harmless error analysis should really look to the whole record. Now, in past cases, this court has said, and the people mentioned many of them in their brief and won't go through all of them obviously here, but there have been many cases in the past where this court has said, you know, there are some errors where they're simple enough that you can sort of paint a picture of the whole trial, put your hand over the error and see what the sum total of the rest is, and that will tell you if the error is harmless. Most of those cases involve simply looking at the strength of the evidence without one piece of evidence as part of the analysis. However, there are other errors that are more complex, that require a more particularized analysis. And this error here appears to be one of them because it involves not just an evidentiary ruling, but when that ruling is made, and since the ultimate goal of harmless error analysis is to find out whether absent the error, the outcome of the trial would have been affected. In order to determine whether the absence of a timing error would have affected the trial more than simply looking at, you can't just put your hand over one part of the trial or another. You have to consider several moving parts. And so the people have suggested four factors to look at. And, of course, as the people were saying, look, we need to look at the whole record here. As in all these cases, we're not suggesting that this court look exclusively to these four factors, but include these four factors in any analysis of a Patrick error. The first, of course, being the strength of the evidence. The second being the need, the defendant's need to testify. The third being the admissibility of the prior convictions. And then the fourth being the use, if any, of the prior convictions in the closing argument. Applying those standards here, what you see is that the people have shown in their brief, and with a lengthy argument, that the evidence here was overwhelming. And the people have put in their argument that this court's opinion in People v. Hart clearly shows, it's right on point and clearly shows that the evidence here is overwhelming. And the people would note that in two briefs, the defendant has not distinguished that case and has not mentioned it at all. And so the people would ask this court to follow its opinion in People v. Hart. And really, there is no question here that the evidence is strong. As far as defendants' need to testify, that really is well demonstrated by the testimony of the only other defense witness. As you'll notice, Trenton Greer testified as the only other defense witness, and the defendant in his brief called what he testified to an alibi. However, Greer's testimony really is the opposite of an alibi. An alibi is testimony that establishes I was somewhere else when the crime was committed, so I could not have committed that crime. Greer's testimony, on the other hand, establishes the defendant was at the scene of the crime with more than sufficient time to commit the charged offense. That's the opposite of an alibi. It's not an alibi at all. But more importantly, if Greer testified, the jury would be left with significant questions from his testimony that would all his testimony effectively hurt defendant's case more than it helped. If you consider, Greer testified the defendant came in from out of town, he had luggage, he was dropped off at 1115, and he said he was going to a hotel, he had a $10 bill in his pocket. All those facts were facts testified to by Greer. But if you look at those facts without the testimony of the defendant, the jury would be left to wonder, well, what happened after 1115? They don't know. The Chicago Police Department testified to what happened after 1115, but Greer did not. What happened? Why was defendant found and arrested on the north side of the street when the hotel was on the south side of the street? If defendant said he was going to the hotel, he wasn't arrested in the hotel, he wasn't arrested in front of the hotel, why was he on the north side of the street? Where was defendant's luggage? Greer testified the defendant had one piece of luggage with him. Where did the extra $6 come from? Greer also testified the defendant lived in Detroit. Why did defendant tell the Chicago Police Department when he was arrested that he lived in Chicago? All these questions are left from Greer's testimony, and it makes it clear that his testimony leaves more questions than answers for the jury, and really causes defendant's case more problems than answers. As far as the admissibility, I see that my time is up, but as far as the admissibility goes, the people have demonstrated in their briefs that Atkinson clearly shows that the prior convictions were admissible here, and defendant doesn't, there's no issue as to whether or not the convictions were used in the argument because they were not. So for the reasons stated here, we would ask that you affirm defendant's convictions reversing the appellate court. Thank you. May it please the Court. Jessica Arizo, Office of the State Appellate Defender on behalf of Ira Mullins. First I'd like to start out with the standard that the State has argued about. In this Court's decision in Patrick, it said that the delay in ruling is an issue of constitutional magnitude, implicating the right to testify in the Fifth, Sixth, and Fourteenth Amendments. Although this Court in Averitt did discuss that it did not violate those defendants' constitutional rights because they didn't testify and did not preserve that issue, that did not overrule this Court's determination in Patrick that the proper standard here should be the Chapman standard. Now I'd like to make it clear we're not arguing that this is a structural error. And we are arguing that it is subject to a harmless standard, but that it should be harmless beyond a reasonable doubt. As the appellate court did quote the language from Patrick and say that it, you know, determined that in this case the evidence was not harmless. Granted that court did not go through a detailed analysis and did just quote Patrick, but it's, you know, unclear whether the appellate court did in fact go through a typical analysis and then just, you know, didn't reiterate that all in its opinion. In either case, we do think that there does need to be factors looked at throughout the trial. You need to look at the facts of the case and determine whether or not it is a harmless error. The state has argued that their factors, one of those should be the strength of the evidence in the case. Now this Court in Patrick didn't, in the opinion, didn't discuss whether or not they considered the strength of the evidence. However, if this Court determines that it should be part of the harmless error analysis, in this case the strength of the evidence should be part of the harmless error analysis. Now, the police officer that testified was one police officer that testified who was the eyewitness. He testified that he was three to four houses down across the street, kiddie corner, on the roof of a three-flat. Yet in his report he didn't mention that he used binoculars. And he didn't mention that the, that Mullins was standing ten feet from a light post, which was 11 to 1130 at night. So obviously these are important things that, you know, an experienced officer would put in the report. So it's not as though that the state's evidence was unassailable as the state argued in its brief. And the fact that we, we know that the jury didn't think the evidence was overwhelming. And we know that because the jury, during the deliberations, asked to see not only the evidence, the stipulation of the defendant's prior conviction, but also asked to see that police report that was used only to impeach this officer. Now, granted, they weren't given it because it's not evidence and that wouldn't have been proper. But the fact that they wanted to see that shows that the jury was debating the credibility of the officer. And obviously they didn't think that the evidence was as, you know, is overwhelming as the state would have you believe. Counsel, if, if we do affirm the appellate court's reversal, how would the new trial be any different? Right. I think that the trial would look substantially different. I mean, this error, it's not like a piece of evidence, you know, like a hearsay statement that came in that could, you know, would come out and you could say, oh, that, you know, the trial would be the same. Here, this error affected every decision that the judge, I'm sorry, that the attorney made with the client. You know, whether to talk about an opening argument, I mean, opening statement, whether or not to testify. If you do testify, do you anticipatorily disclose it? You know, all of these things could be different on a new trial. And it shouldn't be, it shouldn't be taken lightly. You know, the opportunity to anticipatorily disclose the conviction. Is this court known to impact it? An important way to lessen that impact of that prior. To say, you know, imagine the defendant testifies as he did in this case, goes through cross, redirect, never mentions the prior. And then the state can say, you know what, jury, by the way, not only does he have a prior conviction, but it's the same offense. Now, that's a markedly different reaction that the jury would have versus, you know, the defendant's getting up and testifying and saying, you know, I have, I do have a prior conviction. But that doesn't mean I did it this time. You know, the jury in the case, as it happened here, might feel that the defendant was hiding that from him. You know, that he was keeping that from him. And when we're talking about the defendant's credibility, that's an important factor. And also, I would argue that despite what the states argued, Mullins did not, would not need to testify in retrial. He would not need to testify. He could rely on the testimony of Trenton Greyer, who testified that he dropped him off there at 1115. This already contradicts the police officer's testimony that he was witnessing Mullins engaging in these transactions starting at 11 and going to 1130. But the alibi witness placed him at the scene of the crime without any alibi for defendant's conduct for at least 15 minutes. Wouldn't you agree to that? Well, that's correct, that there would be no explanation of what happened from 1150 to 1130. But again, given that the officer has testified that this has been going on 15 minutes prior, it's going to bring doubt into the credibility of that officer, whether he's telling the truth. If we have a witness saying, well, no, he dropped him there at 1115. Were these times, were the testimony regarding these times approximations, or were they 11 and 1115? Well, the 1115 testified that a defense witness said that he happened to look at his phone when they dropped him off. And he knew what time it was. And the officer? And I believe the officer said, I believe he said 11, I can't remember if he said approximately, but I believe he said 11 to 1130 was the actual arrest. Another point I'd like to make that the state. What about, before I get off here, what about the money? Yeah, there was a discrepancy between, well, the money would be a discrepancy between, I'm sorry, do you mean the fact that it was different than the defendant's testimony? Well, the witness was, what, $10 in a $10 bill and a $1 bill? Right. Instead of the fives. I'm sorry. I mean, this is, you know, this is a factor the jury would consider. I don't think that it completely erases the benefit of Grayer's testimony if there's a discrepancy in the amount of bills. I mean, it's just another factor that the jury needs to consider. Right. But all of what we've talked about with the discrepancy in the money and the time certainly would weigh on whether or not the defendant would feel that he should testify. Right. But again, he might. You wouldn't say in a retrial that he definitely would not testify, would you? Well, I would, obviously I have no way of knowing whether or not he would. But he would have a different, you know, he's going to have a different mindset when he decides whether to testify the second time, because the judge is going to have made the proper ruling and said whether or not it's going to come in. So he's going to take that, the facts that you've mentioned, and balance that against the jury knowing about this prior conviction, and then decide based on all of that whether he would testify. Did they recover drugs from the fence where the officer testified the defendant went to pick up the narcotics? That's correct. They did recover? There was nothing found on the defendant's person, but there were drugs found in the fence post. Thank you. Is it correct that without the defendant's testimony concerning that 15 minutes, there would be nothing to controvert the officer's testimony that he was out there, at least during that 15-minute period? Yeah, well, I believe that there was nothing, there's no defense, there would be no defense testimony to explain what would happen during that 15 minutes. The state didn't quite get to it in his argument here. He did address in the briefs the fact that a key factor in your harmless error analysis, they believe, should be whether or not these convictions were admissible. Now, whether or not the conviction is admissible, we believe should not be part of the analysis, because that could boil every single Patrick issue down to hinging on this Montgomery factor. I mean, just because a conviction is admissible doesn't mean that it's not going to be prejudicial. In Patrick, this court didn't even address whether or not the convictions there were admissible. So even though the conviction might be properly admitted, we argued in this case it was not, but even if this court determined that it was properly admitted, that doesn't really factor into a harmless error analysis. You know, the delay in ruling is a serious error that shouldn't come down to whether or not the judge got the second part right, you know, the Montgomery balancing test right. So what should they look at? Well, we believe, as I stated in the briefs, they should look at, it's kind of, you know, the best way I think about it is sort of a continuum of prejudice, because certain defendants are going to be prejudiced more so under certain factors than others. So the things that this court looked at in Patrick, you know, the fact that a defendant's required to testify without evaluating the impact on his testimony of the conviction, and that will affect different defendants in different ways. In this case, it was the same offense. So that consideration under that factor, the fact that he has to make that decision of whether to testify, knowing that the same conviction could come in, would be a stronger error. The fact that a defendant is unable to anticipatorily disclose the priors, as I mentioned earlier. Whether the decision, whether to testify is vital to the defense, whether the testimony of the defendant would absolutely have to testify. And then the impact of the conviction on credibility, which is a point I haven't gotten to yet. In Patrick, this court noted that the state used the convictions in closing argument, referred to them. And also, this court noted that the jury reduced to second degree. And this showed a sort of balancing of the fact that the jury, without this conviction, maybe the jury potentially could have acquitted. And here, there is an impact on the conviction. The conviction did impact on the credibility, despite the fact that the state did not explicitly mention the priors in closing. The main bulk of the closing argument was talking about the fact that the defendant's testimony was ridiculous and hogwash, and we know that this impacted the jury. Whereas in Patrick, we're not sure if those comments that, you know, where the prosecutor mentioned the priors, we don't know really if that affected the jury. But here, we know that the prior conviction did impact the jury, because they asked to see the stipulation again. They asked to hear the stipulation again, even though they had just heard it, you know, right before the closing argument. So it wasn't as though they had forgotten the stipulation, but maybe they wanted to look at it again, see what the conviction was for, and discuss that as part of their analysis during their deliberations. So we know that this conviction did impact his credibility, because the jury was considering it. And again, regarding the factors that we discussed, if this Court does determine that, you know, looking at the strength of the evidence should be one of the factors, again, as I've argued, we believe the evidence here was not overwhelming, but it needs to be made clear that this shouldn't be the only factor, or this shouldn't be the main factor, because as the state acknowledges, this error is different than in other cases. You know, this error isn't something that is just a piece of evidence like a hearsay statement or something that comes in that you can sort of look at the strength of the evidence aside from the error. Because as I argued earlier, you know, this really permeates the whole trial and really affects every aspect of the trial. Are there any further questions? You actually have a cross appeal, right? Correct. I was not going to argue that if this Court has any particular questions regarding it. You haven't abandoned it. No, I have not abandoned it. I just was not going to use this time to argue. If there are no further questions, I would just ask that this Court affirm the appellate court's decision and remand for a new trial. Thank you. Just briefly, Your Honors, I wanted to mention the first time up here, and just forgot, just to make clear that no one is contesting here today that there is a Patrick error in this case. That's not even an issue. There clearly is a Patrick error here. It's just a question of whether or not that error is harmless and what standard of review and what analysis should be applied to that error. Your Honor asked about whether or not the times were approximate, and actually on supplemental record, page 829, Officer McGrory did in fact testify. He was asked, what time approximately did you begin this surveillance? And he said around 11 p.m. And certainly there's no testimony involved in the case that Trenton Greer's phone and the officer's watches were all synchronized or anything of the sort. But still, the times eventually essentially have evolved down to is that Trenton Greer put him there at 1115, and the officers clearly were watching defendant on the northwest corner of this intersection for a significant amount of time after that, and more than sufficient amount of time after that for him to commit the offense of possession of a controlled substance with intent to deliver. I mean, as offenses go, this is not one that requires a great amount of time to commit. All you need is the amount of time to establish constructive possession and some intent to deliver, which was clearly established when the officers saw not just the transactions where he accepted money and then gave away small packets of heroin, but in fact when the officers found the heroin itself, it wasn't just in a pile. You know, this was actually in tin foil package. This is prepackaged for sale. And counsel commented on the strength of the evidence here, and one thing I want to make clear is there really is only one argument that's been used. You know, the people in their brief called the state's case unassailable, and it's because there's only one argument that's been used at trial and now on appeal to try and poke a hole in the people's case, and that is this vice case report that Officer McGrory filled out. But you'll notice in Officer McGrory's testimony, he said that this vice case report was not intended to include every single detail of the entire arrest. And so by the nature of the report then, it's inevitable that some things are going to be left out. Yes, he left out the binoculars and the exact distance he thought the defendant was away from the light post, but again, the report isn't intended to include everything, and this is the one and only fault that they have found at the trial level and now the appellate level with the people's case, and that's why the people have called this unassailable. And moreover, you'll notice how much corroboration there is between the evidence of the officer, the surveillance officer and the officers who did the arrest, because the officers who did the arrest, they were directed to the fence post that he saw him retrieving objects from, and in that fence post is where they found the narcotics. The officers had a search incident to arrest, and the surveillance officer saw him putting money in his pants pocket. In a pants pocket, they found three fives and three singles. He had three transactions that the officers saw, and they also found the money in crumpled up condition. It's not as if they were all in a wallet neatly folded and he didn't see him placing it in a wallet or something of the sort. He saw him just quickly shove it into his pocket, and so the condition of the money, the denominations of the money and the amount all fit with and corroborate the testimony of the surveillance officer. Now, as far as considering, first of all, the question the jury asked, the people would ask this court to follow its opinion in the case of People v. Patterson. Patterson involved a Crawford violation, hearsay testimony, which was found to be testimonial admitted against the defendant's Sixth Amendment rights. In that case, this court found a Crawford violation, but then looked to see if the error was harmless, and one of the arguments the defendant made in that case, that the error was not harmless, was that the jury asked a question, asked to see the evidence admitted in violation of his constitutional rights, and this court said, rejected defendant's argument that that showed that there was no question that the jury considered that evidence, and this court said, quote, however, the mere fact that the jury asked for a copy of the testimony does not create a reasonable probability or even a reasonable possibility that the jury relied on that testimony in reaching its verdict to contend that it does, in our view, is purely speculative. And so we would ask this court to follow that and reject defendant's argument that just because they asked a question about this evidence does not mean that they considered it in their verdict, and to say so would be pure speculation. And, in fact, when you look at it, too, this is why the admissibility needs to be part of the harmless error analysis, because in order to determine whether, absent the error, the trial would have been affected and the outcome would have been affected, when we're dealing with a Montgomery decision, which is any Patrick error deals with a Montgomery decision, you're going to have to look at that Montgomery decision, because if you absent the error, the court's decision is going to take place before trial. That's how you erase the error. You make the timing proper. But then you need to see, well, okay, should those prior convictions come in, because if this court were to look at a case, obviously not this one where the people were arguing that they were properly admitted, but if this court were to look at a case in the future and say, well, you know what, we don't think these prior convictions were properly admitted, well, that may change things. That's a benefit to defendants in these cases, and obviously the people understand that, but what we're arguing is for this court to take a harmless error analysis of Patrick cases that gets it right. We really want to see a harmless error analysis here that shows a proper analysis of a Patrick error to show whether or not, absent the error, the outcome would have been effective. Oh, and just briefly on the standard review, the people would just say that Chapman does not apply after this court's decision in average, because Chapman explicitly states we're only making this ruling because of constitutional error, the presence of a constitutional error. There's no language in Chapman that says errors of constitutional magnitude, errors that implicate constitutional rights, because there's no language whatsoever in Chapman that says that. It only states we have a constitutional error here, what standard should we apply, and thus based on this court's decision in average, which clearly stated there is no constitutional error here, Chapman is inapplicable to this case, and this is why we have asked this court to reconcile the differences between this court's opinion in average, or excuse me, between this court's statement in Patrick that the harmless beyond a reasonable doubt standard applies, and this court's statements elsewhere, such as in re E.H., which this court said that the harmless beyond a reasonable doubt standard only applies when there's a constitutional error, otherwise the regular harmless error standard applies. So with that, Your Honors, I would ask this court to affirm the defendant's convictions and reverse the appellate court. Thank you. Thank you, counsel.